## Istocin's Estate.

Argued November 18, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Thompson Bradshaw* of *Bradshaw, McCreary, Stevenson & Reed,* for appellant.

*Robert Ritchie* and *Homer H. Swaney,* with them *George W. Lucas,* for appellees.

OPINION BY RHODES, J., February 26, 1937:

This is an appeal by the executor of the last will and testament of J. J. Istocin, deceased, from the decree of the orphans' court dismissing exceptions filed by him to the adjudication of his account, and confirming the auditor's report absolutely.

J. J. Istocin died testate December 29, 1932, and on January 6, 1933, letters testamentary were granted to J. Edward Istocin, who had been appointed by the testator as executor of his last will and testament. He and his brother, James R. Istocin, were residuary legatees. The estate consisted entirely of personalty, and the inventory and appraisement filed show an appraised value of $3,559.44. The decedent was an undertaker at the time of his death. The executor paid no attention to the administration of the estate, but entrusted the same entirely to his brother, James R. Istocin. The latter acted for the executor as his authorized agent in such administration. The executor and his brother were sons of the decedent, who also left surviving a widow, and a stepson, William R. Towcimak. The stepson, at the time of the death of the decedent, was assisting him in the conduct of his undertaking business, and was registered as an apprentice.

After the death of the decedent the business was operated by James R. Istocin. A public sale of the assets of the estate was held on March 20, 1934, which produced $345.50. The accounts receivable were appraised at $857; $271.50 of which had been collected, and the balance was sold for $50 at the sale. They were resold the same day by the purchaser for the same amount to James R. Istocin. The goods and chattels brought $295.50, and had an inventoried value of $1,227.75. The purchaser of the goods and chattels likewise sold to James R. Istocin most of these items for $264. The repurchase of the accounts receivable and the goods and chattels by James R. Istocin, the executor's brother and authorized agent, was the result of some previous understanding and arrangement between him and the purchaser at the sale.

An account was filed by the executor, after he was cited to do so, which showed a deficit of $167.52. Exceptions to the account were filed by William R. Towcimak and others, and on motion of exceptants an auditor was appointed. Testimony was taken; the auditor passed on the exceptions to the account, restated the account which then showed a balance in favor of the estate of $586.75, and prepared a schedule of distribution. Exceptions were filed to the report of the auditor and dismissed by the court which approved the findings of fact, the conclusions of law, and the schedule of distribution of the auditor, and confirmed the report absolutely. The accountant has appealed from the court's decree.

The questions which have been raised on this appeal are largely dependent upon the findings of fact; and such findings by an auditor, approved by the court, are entitled to as much weight as the verdict of a jury, and we will set them aside only for manifest error. *Locher's Estate (No. 2)*, 219 Pa. 46, 67 A. 954; *Grollman's Estate (No. 1)*, 273 Pa. 559, 117 A. 348.

Appellant's first complaint is that there was no competent evidence to sustain the finding that William R. Towcimak had a valid contract with the decedent whereby he was to be paid $15 per week for his services, which were rendered for a period of 103 weeks. Out of the balance of the estate Towcimak was allowed his pro rata share based on an award of $1,449.11, the decedent having paid on account, as the auditor found, the sum of $95.89.

It is our conclusion that a valid contract was established between the claimant and the decedent, his stepfather, by proof which was sufficiently clear, direct, and positive, and that his claim was properly allowed. The sufficiency of the proofs was not questioned before the auditor, and the validity of the claim was apparently conceded by then counsel for appellant. Notwithstanding such condition of the record, we think that the required measure of proof has been furnished. The claimant had been attending the University of Pittsburgh for a year and a half, and his tuition there had been paid by his mother. Decedent was ill, and, during the Christmas Holidays, 1930, he concluded that it would be advisable for him to go to Mount Clemens for his health. At that time claimant desired to return to his studies, but his stepfather requested him to stay home and take charge of his business. For doing so he stated that he would pay him $15 a week. This occurred on or about December 28, 1930. Decedent, immediately after the holidays, left for Mount Clemens, and claimant took charge of the business. He continued to work for his stepfather until the latter died December 29, 1932. During the period of his employment claimant spoke to his stepfather about his compensation, but was put off with some excuse on each occasion. Decedent, however, never denied the agreement which was alleged to have been made; nor do we find from the testimony any inferential repudiation of it. The testimony was

likewise sufficient to show that there was no payment of the claim other than the amount found by the auditor. Mrs. Johanna Istocin, mother of the claimant and wife of the decedent, and Stephen Chyka, a brother of the claimant, were present at the time the agreement was made, and testified that the claimant, although he had intended to return to the university to pursue his studies, gave up his scholastic work at the request of his stepfather and entered his employ, and that he was to receive for his services the sum of $15 per week. There was other testimony showing the nature of the services which claimant rendered during the period in question. Claimant himself was called and examined, and then subjected to a lengthy cross-examination as to relevant facts prior to decedent's death. He testified as to his employment, the services he rendered, and nonpayment. It is significant that such facts were developed on cross-examination, which was directed to show payments and set-off, and that no question was raised at any time as to his competency. See *Heller et al. v. Fabel*, 290 Pa. 43, 138 A. 217; *Mack's Estate*, 278 Pa. 426, 123 A. 462. There was competent testimony to prove a specific and definite contract fixing the character of services to be rendered by the claimant and the amount of compensation to be paid to him by the decedent, and that the services contemplated were rendered. The auditor, as well as the court on exceptions filed, found as a fact the existence of the understanding, the promise to pay, and nonpayment. Their finding is supported by the evidence.

Claimant was not a domestic servant, and the services which he rendered were not of a domestic character. Hence the presumption that payment was made at regular periods has no application. The claimant did not come within the class to which the presumption is applicable. *Mack's Estate*, supra; *Gibbs' Estate*, 266 Pa. 485, 110 A. 236.

Appellant next complains that there was no competent legal evidence to sustain the surcharge of $390 in connection with the sale of the accounts receivable and the surcharge of $932.25 for loss in the sale of the goods and chattels.

The evidence must be considered in connection with the legal duties and responsibilities of the appellant. We cannot conclude otherwise than that the facts establish gross negligence on the part of the appellant in the administration of this estate. He paid no attention to its administration, but entrusted it entirely to his brother who, he testified, was his authorized agent. He made no effort to convert the assets of the estate into cash for distribution until 1 year, 2 months, and 14 days after he had taken out letters, and during that time allowed his agent to conduct decedent's business. He failed to exercise common care, prudence, caution, and diligence in handling the estate, and he was responsible for and chargeable with what happened through his fault. See *Grollman's Estate (No. 1),* supra. The facts recited by the auditor justified his statement that "the accountant was guilty of gross negligence in dealing with the assets of the estate." This also had the approval of the court below.

It was the duty of the appellant to file an account at the expiration of six months after the grant of letters, as required by section 46(a) of the Fiduciaries Act of June 7, 1917, P. L. 447 (20 PS §831). "The act was passed for the benefit of creditors and beneficiaries and is subject to their expressed desires: Cf. *Keller's Est.,* 224 Pa. 523, 73 A. 926; *Henry's Est.,* 198 Pa. 382, 48 A. 274; *Walworth v. Abel,* 52 Pa. 370. The accountant may not ignore the statutory duty to file the account (*Johnston's Est.,* 9 W. & S. 107; *Constable's Est.,* 299 Pa. 509, 149 A. 743), but failure to perform the duty produces liability only for loss resulting from failure to account, as required": *Stephen's Estate,* 320 Pa. 97,

at page 101, 181 A. 559, at page 561. In *Gardner's Estate,* 323 Pa. 229, at page 235, 185 A. 804, at page 807, in an opinion by Mr. Justice MAXEY, our Supreme Court said: "As was said by Judge GUMMEY, whose opinion we approved in *Borell's Est.,* 256 Pa. 523, 524, 100 A. 953: 'Ordinarily it is the duty of an executor to convert personal property within the year following the grant of letters testamentary (*Merkel's Est.,* 131 Pa. 584, 612 [18 A. 931]), and the rule is to be more strictly construed where the rights of creditors are affected than in cases where the estate is solvent......' " Appellant had no testamentary authority to operate the business of the decedent, nor did he have the sanction of the creditors of the estate. It was his primary duty to liquidate his decedent's assets and pay his debts. The estate was either insolvent at the time of grant of letters to appellant, or was rendered so by the method of its administration. It appears that a portion of the assets of the estate were consumed in the unauthorized operation of the business after the death of the decedent. Instead of subjecting the decedent's personal property to unauthorized use and depletion, it was appellant's duty to promptly convert it into cash for the benefit of creditors.

Appellant was liable and responsible for all of the acts of his agent pertaining to the administration of this estate. An executor cannot use his power for his private benefit, and "he cannot directly or indirectly become a purchaser at his own sale": *Tanner's Estate,* 218 Pa. 361, at page 365, 67 A. 646, at page 648. Appellant's agent could not gamble with the assets of the estate which were entrusted to his care without subjecting appellant to liability for such misconduct. His agent had for all practical purposes taken the place of the appellant in the control, management, and disposal of the estate's assets. The appellant was therefore properly surcharged with the profit which his agent made of

$390 on the accounts receivable which he repurchased from the successful bidder under a collusive arrangement.

We think the appellant was also properly surcharged for $932.25 representing a loss in the sale of goods and chattels of the estate. Many of the goods and chattels set forth in the inventory and appraisement had been used during the operation of the business by appellant's agent. At the sale those remaining brought $295.50. They represented $1,227.75 of the inventory. Much of the inventoried property had ceased to exist. Here, again, appellant's agent illegally became the purchaser. Under the circumstances the auditor and the court below rightly held that the appellant was accountable for the appraised valuation. See *Merkel's Estate*, 131 Pa. 584, 18 A. 931; *Hermann's Estate*, 226 Pa. 543, 75 A. 731.

Appellant finally complains that he was surcharged with the sum of $100, which he had been paid for his services as executor, and with the sum of $200 of the expenses of the audit which were $310. The auditor and the court below were justified in concluding that he was guilty of gross negligence in dealing with the assets of the estate, and that he should therefore be deprived of all compensation for services. We sustain this surcharge. See *Locher's Estate (No. 2)*, supra.

The costs of an audit are usually deducted from the funds for distribution, although this is not an inflexible rule. The orphans' court administers equity, and, as in an equity proceeding, the disposition of the costs is a matter largely within the discretion of that court; and where a portion of the costs of an audit has been placed upon the accountant, we will not reverse unless there has been an abuse of discretion. See *Grollman's Estate (No. 2)*, 273 Pa. 565, 117 A. 351. The appellant was grossly negligent in the management of the estate. The account which he filed showed a deficit of $167.52; ex-

ceptions were filed to it; an auditor was then appointed; and after it was restated by the auditor it showed a balance in favor of the estate of $586.75. The appellant was surcharged a total of $2,300.18. At the time fixed for the first hearing before the auditor, appellant did not appear in person, nor was he represented by counsel; and there were several continuances before he did appear.

The auditor was appointed: (1) To pass on exceptions to appellant's account; (2) to restate the account if necessary; and (3) to make distribution of the balance shown. The auditor was in the best position to determine what proportion of the expense of the audit was chargeable to disposition of the exceptions and to restating the account, and the proportion chargeable to the distribution, including consideration of creditors' claims. This surcharge having been made by the auditor and approved by the court below, we cannot conclude, after a consideration of all the circumstances, that the whole burden of the contest should be borne by the estate, or that a division of the costs was an abuse of discretion. See *Fieser's Estate*, 15 Pa. Superior Ct. 447; *Garman's Estate*, 32 Pa. Superior Ct. 494.

Appellant's case has been well presented by his present counsel on this appeal, who filed an exhaustive brief on his behalf; and we recognize the fact that appellant's position is the result of acts of omission rather than acts of commission. However, he entrusted the control and administration of the estate to another, and, unfortunately, must suffer for the unbusinesslike and unjustifiable manner in which it was handled. The pressure of his own duties apparently prevented him from giving the estate his personal attention or in properly supervising the acts of his agent. If he had desired, he could have relieved himself of his burden, and another could have been appointed to legally assume his fiduciary responsibilities.

168

The decree of the court below is affirmed; appellant to pay the costs.